No. 3-06-0085

Filed September 13, 2007.

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| ADDISON INSURANCE COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| DONNA FAY, as Independent | ) | |
| Administrator of the Estate | ) | |
| of Justice Steven Carr, | ) | No. 01-MR-717 |
| Deceased, LAURA SHACKELFORD, | ) | |
| as Special Administrator of | ) | |
| the Estate of Everett Lee | ) | |
| Hodgins, Jr., Deceased, and | ) | |
| DONALD PARRISH, d/b/a PARRISH | ) | |
| BLACKTOP, INC., | ) | Honorable |
| | ) | Herman Haase, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the opinion of the court:
_____


Plaintiff, Addison Insurance Company, brought a declaratory judgment action against Donna Fay, as Special Administrator of the Estate of Justice Carr, Laura Shackelford, as Special Administrator of the Estate of Everett Hodgins, and Donald Parrish, d/b/a Parrish Blacktop, Inc., to determine the extent of insurance coverage available to Parrish to pay claims brought by Fay and Shackelford resulting from the deaths of their sons. The trial court declared that under the terms of the commercial general liability policy issued to Parrish the boys' deaths were two separate "occurrences," thereby allowing aggregate liability coverage of $2,000,000. We reverse.

Parrish owned and operated Parrish Blacktop, Inc. The business was located on several acres of commercial property which included an excavation pit. Addison Insurance Company issued a general liability insurance policy to Parrish that provided coverage limits of $1,000,000 per "occurrence" and $2,000,000 aggregate. The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy did not define the term "accident."

On April 30, 1997, Justice Carr, age 14, and Everett Hodgins, age 15, left Hodgins' house at approximately 5 p.m. to go fishing at the local cooling lakes located on Commonwealth Edison property near Carr's house. They did not return home and were reported missing around 10:30 that evening. A severe storm accompanied by heavy rain, high winds and rapidly dropping temperatures struck the area sometime after the boys were last seen. The lowest recorded temperature on May 1 was 34 degrees Fahrenheit. Investigators discovered the boys' bodies on May 3, 1997, on Parrish's property. Both boys were trapped in the sandy, clay bottom excavation pit that had partially filled with standing water. Their bodies were located in close proximity to each other. Carr was found waist-deep in water with his feet and legs covered in submerged clay soil. Hodgins was lying next to Carr with one leg embedded in the soil.

The parents of both boys sued Parrish separately, alleging that he negligently caused the deaths of the two boys by failing to properly secure and control access to his property. Addison defended the consolidated lawsuit and filed a declaratory judgment

action against Fay, Shackelford and Parrish to obtain a judicial declaration that the boys' deaths resulted from a single occurrence, rendering the $1 million "per occurrence" limit applicable.

Through deposition testimony, defendants' expert, Eugene Holland, opined that Parrish's use of his property created a dangerous condition, which required proper site security and control. Holland testified that the boys' deaths would have been prevented if Parrish had proper security because Carr and Hodgins would not have been able to access the property.

Officer Gary Knight testified in his deposition that the officers themselves became entrapped as they tried to remove the boys. He opined that Carr likely became stuck in the soil and water when he tried to jump over the water in the bottom of the excavation. Knight assumed that Hodgins attempted to come to his friend's aid. Hodgins appeared to have sat down next to Carr, tried to pull Carr free, and in the process also became entrapped. Lieutenant Jerome Nudera, agreed with Knight's assessment of the scene.

Dr. Larry Blum, the forensic pathologist who performed autopsies on both bodies, testified through deposition that Hodgins died of hypothermia due to entrapment in the sand. Blum determined that Carr's death was caused by drowning secondary to hypothermia due to entrapment. Mary Case, Addison's expert pathologist, agreed with Carr's findings. She concurred that the drowning of Carr was secondary to, or a result of, the advancement of hypothermia.

Addison filed a pretrial motion requesting that the circuit court rule that defendants, as plaintiffs in the underlying suit,

bore the burden of proving that the deaths of Carr and Hodgins were caused by separate occurrences. The court denied the motion and held that as the plaintiff in the declaratory judgment action, Addison bore the burden of proving that the boys' deaths resulted from a single occurrence.

At the conclusion of a bench trial at which the court considered only the deposition testimony, the court concluded that there was sufficient evidence to show that the causes and circumstances of death were different. Consequently, the court held that the boys' deaths were two "separate occurrences," and the $2 million aggregate limit applied.

ANALYSIS

I. Burden of Proof

Initially, Addison argues that as the insurer of the defendant Parrish in the underlying wrongful death suit, the burden is on Fay, Shackelford and Parrish in this declaratory judgment action to prove that the deaths were the result of two separate and distinct occurrences.

It is well established in Illinois insurance law that the insured bears the burden of establishing that a claim falls within the terms of a policy. Waste Management, Inc. v. International Surplus Lines Insurance Co., 144 Ill. 2d 178 (1991). However, once there is such proof, the burden is on the insurer to prove that the loss was limited or excluded by a provision of the contract. Farmers Automobile Insurance Association v. Susan Gitelson, 344 Ill. App. 3d 888, 896 (2003). The plaintiff in a declaratory judgment action bears the burden of proof. The Board of Trade of the City of Chicago v. Dow Jones & Co., 98 Ill. 2d 109 (1983).

4

In the underlying lawsuit, Addison agreed to settle the parents' claims for the policy limits as a third-party defendant. Addison then filed a declaratory judgment action, asking the court to find that the policy's single occurrence provision limits coverage to less than the aggregate limits provision. As the plaintiff, Addison bears the burden of proving that the limitation applies.

## II.  Single or Separate "Occurrence"

The case before us concerns construction of the limitations provision of the Addison Insurance policy.  None of the parties dispute that the horrible event that took the lives of Carr and Hodgins qualifies as an occurrence for which Addison Insurance must provide coverage.  The question is whether that event constituted two occurrences under Parrish's liability policy; if so, the aggregate coverage limit would apply to the underlying lawsuit.

The interpretation of an insurance contract is a matter of law subject to de novo review.  Illinois Farmers Insurance Co. v. Marchwiany, 222 Ill. 2d 472 (2006).  Insurance policies are governed by the same rules of construction applicable as other types of contracts.  Nicor, Inc. v. Associated Electric and Gas Insurance Services Limited, 223 Ill. 2d 407 (2006).  A court's primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement.  Crum & Forster Managers Corp. v. Resolution Trust Corp., 156 Ill. 2d 384 (1993).  The words of the policy should be accorded their plain and ordinary meaning.  State Farm Mutual Automobile Insurance Co. v. Villicana, 181 Ill. 2d 436 (1998).

To determine the number of "occurrences" as the term is used

5

in most general liability policies, courts around the country have developed two prevailing approaches: the cause theory and the effect theory. Nicor, 223 Ill. 2d 407. Following the majority of jurisdictions, Illinois has adopted the cause approach. Nicor, 223 Ill. 2d at 419-20. Under the cause theory, the number of occurrences is determined by referring to the underlying cause or causes of damage.[1] See Illinois National Insurance Co. v. Szczepkowicz, 185 Ill. App. 3d 1091 (1989). In Nicor, Inc. v. Associated Electric and Gas Insurance Services Limited, the Illinois Supreme Court approved the following test for determining the number of occurrences when applying the cause theory:

> "Where each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, Illinois law will deem each such loss to have arisen from a separate occurrence within the meaning of liability policies containing [per occurrence] language."

Nicor, 223 Ill. 2d at 432, citing Mason v. Home Insurance Co. of Illinois, 177 Ill. App. 3d 454, 460 (1988).

Although Illinois has adopted the cause approach to determine the number of occurrences within the aggregate limits of a policy, the distinction between cause and effect is not always clear. As this case illustrates, what appears to be a single accident to the person who triggered it, may be perceived as multiple accidents or occurrences to those who sustain the injury. Applying the cause

---

[1] The effect theory determines the number of occurrences by looking at the effect an event had, i.e., how many individual claims or injuries resulted from it. Nicor, 223 Ill. 2d at 418.

theory to these unfortunate and unique facts is difficult, at best. Given the diverse contexts in which the meaning of "occurrence" may arise, we focus narrowly on the circumstances that confront us in this case. In doing so, we use an analytical method which we find fruitful. By looking at the relationship of time and space to the occurrence, we can tread a course that leads us to a resolution of the cause under the cause theory.

In Doria v. Insurance Co. of North America, 509 A.2d 220 (N.J. 1986), the New Jersey Supreme Court applied the cause theory to find a single occurrence where two boys were injured in a swimming pool. The boys entered a neighbor's property through a broken fence and were playing near the abandoned pool. One fell in, and the other boy tried to rescue him. The second boy fell in, and both were injured. Holding that there was only one "occurrence" under the insured's policy, the court examined two factors: (1) the injuries resulted from a single cause, that is, the insured's failure to properly fence the pool; and (2) there was a significant temporal and spatial connection between the injuries. The court noted that the boys crawled through the fence together, became exposed to the pool at the same time, were injured almost simultaneously and were rescued at the same time. Doria, 509 A.2d 220.

In Illinois National Insurance Co. v. Szczepkowicz, 185 Ill. App. 3d 1091 (1989), a tractor-trailer stopped in middle of the roadway and was struck by a vehicle. The driver immediately moved the truck forward approximately 12 feet and then stopped again. He did not completely remove the vehicle out of all lanes of traffic. Five minutes later, another automobile smashed into the side of the

stopped tractor-trailer. The court stated that a single accident or occurrence will be found under the cause theory "if cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event." Szczepkowicz, 185 Ill. App. 3d at 1095. The court concluded that, based on the circumstances, the two collisions were not caused by a "single force *** or uninterrupted continuum that, once set in motion caused multiple injuries." Szczepkowicz, 185 Ill. App. 3d at 1096. Further, the two collisions were not substantially the same in time or space because the driver had moved the truck forward and five minutes had elapsed between the two accidents.

Other jurisdictions have also incorporated the time and space analysis when applying the cause approach. See Pemco Mutual Insurance Co. v. Utterback, 960 P.2d 453, 456-57 (Wash. 1998) (pedestrian was first struck by insured attempting to park her car, car immediately lurched forward and struck pedestrian again; court held that a single accident occurred because of "the interdependent nature of the two impacts and their continuity and proximity in time and location"); Olsen v. Moore, 202 N.W.2d 236, 241 (Wis. 1972) (one "occurrence" for purposes of policy limits where insured's vehicle struck two vehicles "almost instantaneously;" there was virtually no "time or space interval" between the two impacts, and the driver never regained control over vehicle.)

The above case law suggests that if cause and injury are simultaneous or "so closely linked in time and space as to be considered by the average person as one event," courts have found that liability exists based on a single occurrence. See Doria, 509 A.2d at 224-25; Szczepkowicz, 185 Ill. App. 3d at 1095. If,

8

however, enough time has elapsed between the injuries or damage to property, or if the injuries or damages are sufficiently separated in physical space, courts have been inclined to conclude that there were multiple "occurrences." See Nicor, 223 Ill. 2d at 433-34. Thus, in analyzing these facts, we must consider (1) the negligent act or condition that caused the injury, and (2) how the temporal and spatial nature of the incident may have affected any "separate or intervening acts" or "increased the insured's exposure to liability" under Nicor.

First, the losses here arose from a single negligent act or condition. Parrish failed to properly secure entry into the excavation pit, a single negligent condition which led to the boys' injuries. Thus, the boys' tragic deaths were the result of one cause.

Second, we conclude that the unfortunate events resulting in the boys' deaths are so closely linked in time and space as to be considered by a reasonable person as one "occurrence." As the record indicates, the boys entered the property together, they journeyed across the same path leading into the excavation pit simultaneously, and they became entrapped in the muddy soil within moments of each other. Their deaths were both caused, at least in part, by the freezing temperature of the air and water. Three days later, their bodies were found lying only inches apart. Based on these significant temporal and geographical facts, it is difficult to conclude that the claimed losses resulted from more than one occurrence.

Because the boys' deaths resulted from a single cause and were not sufficiently separated in space or time, we are compelled to

9

conclude that the general liability insurance policy is limited to the maximum coverage ($1 million) for a single "occurrence."

CONCLUSION

The judgment of the circuit court of Will County is reversed.

Reversed.

CARTER, J., concurs.

JUSTICE WRIGHT, dissenting:

The majority correctly cites to *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 419-20 (2006), wherein our supreme court established that Illinois would follow the cause approach to define an occurrence for purposes of general insurance liability policies. However, I respectfully dissent from the majority's employment of a "time and space" test to determine that these two tragic accidents constitute one "occurrence." Based on *Nicor*, I reach the opposite conclusion

In *Nicor*, our supreme court explained the cause approach:

> "[W]here each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, Illinois law will deem each such loss to have arisen from a separate occurrence within the meaning of liability policies containing [per occurrence] language." *Nicor*, 223 Ill. 2d at 431-32.

Under *Nicor*, the inquiry should be whether each accident resulted from a separate and "intervening" human act, not whether the accidents were closely related in space and time. The focus should be on the specific event or events that triggered liability. Here, liability was not incurred when the boys entered the property. Nor

did liability arise from the owner's negligence in failing to secure or warn of a dangerous condition. Rather, liability attached only when the first boy entered the pit. The separate and "intervening" human act, as found by the trial court and undisputed by the parties, was the second boy's decision to enter the pit in an heroic, yet failed, rescue attempt.

We must keep in mind, the boys did not die because of their decision to enter the property. Each boy lost his life as a result of his individual, separate decision to enter the pit for a different purpose. Consequently, I believe the proper focus is not on how the boys entered the property, but how each boy entered the water and subsequently perished.

This approach was adopted in *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), and cited by our supreme court with approval. In *Mason*, separate bouts of botulism could have been called the same occurrence arising from the same pool of contaminated food. However, the court viewed each act of serving the tainted food as an occurrence. Here, one hazard, deadly sand, consumed the strength of each boy in different ways and at different times.

The majority relies upon the guidance of *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d 1091, 1095 (1989), decided prior to *Nicor*, which stated that a single accident or occurrence will be found under the cause theory " '[i]f cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event [citation].' " The supreme court in *Nicor* did not adopt a "time and space" inquiry as part of its cause theory analysis. Here, as

horrific as it is to imagine, even under the "time and space" inquiry, the autopsies corroborate what the physical evidence at the scene revealed. The events that resulted in each boy's death did not occur simultaneously.

The majority recognizes Addison bears the burden of proving the single occurrence limitation applies, but then relieves Addison of this burden. There is a distinct lack of direct evidence regarding the circumstances of these occurrences. The evidence is lacking because the boys remained undiscovered for days. The difficulty of this case invites conjecture, but the reality is there were no eyewitnesses to the boys' entry into the hazardous water. Addison has no direct evidence that the best friends entered either the property or the pit together and such conclusion is speculative. Consequently, Addison cannot establish either death resulted from the same occurrence.

The police rescue and investigation concluded the boys entered the excavation separately, under two different circumstances, at different times. One boy was found facing the bank with both feet and legs embedded in the sand, while the other boy was found facing the opposite direction with only one leg embedded in the sand. Two officers testified it was likely Justice's feet and legs were entrapped in the sand when he attempted to jump over some water, and Everett later entered the area and one of his legs became entrapped as he attempted to rescue his friend. We do not know whether Everett acted immediately, or contemplated entering the pit for minutes or hours before he chose to enter the water. Sadly, the autopsy revealed one boy perished from drowning and the other succumbed to the cold, but the pathologist made no determination

12

regarding the separation of time between each death.

Applying *Nicor* to the scenario advanced by Addison, one boy became entrapped by accident, and the other boy deliberately entered the pit, heroically aware of the hazard. These were separate entries, separate intentions, separate acts, and should be viewed as separate occurrences. The occasion of friendship should not negate the separateness of each tragedy. If each boy had been a stranger to the other, fishing at the same spot, the outcome should be the same and support a finding of separate accidents.

I respectfully dissent from the majority and would find, based on *Nicor*, the trial judge correctly found that the boys' deaths resulted from separate occurrences.